**DOCUMENT IMAGING, INC., Plaintiff,**

v.

**IPRO, INC., Defendant.**

**Civil Action No. H–95–3388.**

United States District Court,
S.D. Texas,
Houston Division.

Nov. 4, 1996.

H. Miles Cohn, Seiler Cohn & Stebbins, Houston, TX, for plaintiff.

Allan Brent Diamond, Hughes & Lace, Houston, TX, for defendant.

### MEMORANDUM AND ORDER

ATLAS, District Judge.

Plaintiff Document Imaging, Inc. ("Plaintiff" or "DI") has brought this suit against Defendant IPRO, Inc. ("Defendant" or "IPRO") asserting causes of action for breach of contract, fraud, and quantum meruit recovery. Plaintiff's Original Petition (Exhibit B to Notice of Removal [Doc. # 1] ). IPRO has moved this Court for partial summary judgment as to DI's claims for breach of contract, fraud, and lost profits damages. Defendant IPRO, Inc.'s Motion for Partial Summary Judgment [Doc. # 19] ("Motion").[1] The Court has considered the Motion, DI's response and IPRO's reply, all other matters of record in this case, and the relevant authorities.

At a Pretrial Conference on October 18, 1996, the Court denied Defendant's summary judgment motion, based upon the authorities cited by the parties. The Court also indicated its intention to issue a written opinion. In the course of drafting this opinion, the Court has conducted extensive independent research. The Court now concludes that under the dispositive authorities several of Plaintiff's claims are insufficient as a matter of law. Therefore, for the reasons stated herein, the Motion is now **GRANTED IN PART**. This opinion supersedes the Court's oral rulings at the Pretrial Conference, which are hereby withdrawn.

### FACTUAL BACKGROUND

Defendant IPRO is the inventor and owner of document imaging software, which electronically organizes and accesses large numbers of documents. Plaintiff DI was formed in 1991 for the purpose of marketing other companies' document imaging systems.

In late 1991, David Schmidt, President of DI, contacted IPRO about the possibility of DI becoming an agent or authorized representative of IPRO. Affidavit of David Schmidt [Doc. # 23] ("Schmidt Affidavit"), ¶ 4, at 2.[2] In order to facilitate their discussions, DI and IPRO entered into a Confidentiality Agreement on January 5, 1992. Confi-

---

1. IPRO's Motion does not address DI's claim for quantum meruit recovery nor its alleged damages related to the transaction between IPRO and the Coastal Corporation.

2. IPRO has moved to strike the Schmidt Affidavit on numerous grounds. *See* Doc. # 27. IPRO repeatedly objects to Schmidt's statements on the grounds that they (i) speculate as to IPRO's intent to enter into an agreement, (ii) render an improper opinion regarding the existence of an agreement, and/or (iii) lack foundation. The Court considers Schmidt's statements to be his subjective opinion regarding the course of dealings between DI and IPRO, and not as conclusive evidence of IPRO's intent or of the existence of any agreement between the parties. These objections by IPRO, and all others not specifically discussed herein, are overruled, and the Motion to Strike Schmidt Affidavit is denied.

dentiality Agreement (Exhibit A to Schmidt Affidavit). On January 6, 1992, Schmidt received from IPRO by fax a copy of two proposed agreements, an IPRO Value Added Reseller Agreement and an IPRO Service Center Agreement. Schmidt Affidavit, ¶ 5, at 2; Form Agreement faxed to D. Schmidt in January 1992 (Exhibit B to Schmidt Affidavit).

Schmidt states that DI and IPRO did not immediately enter into the proposed agreements because he "had not yet developed an initial major client for IPRO's technology, and IPRO agreed that [DI] would not undertake the relationship (which included initial expenditures for IPRO software) until an initial client relationship was developed." Schmidt Affidavit, ¶ 6, at 2. Until mid–1993, Schmidt worked to develop a customer base for IPRO and obtain an initial sale, making several presentations of IPRO software. *Id.* In early 1993, when it appeared that a contract would be closed with either Susman Godfrey, L.L.P., or the Coastal Corporation, or both, Schmidt began to discuss the closing of a formal agreement with IPRO. *Id.* ¶ 7, at 2.

By letter dated February 15, 1993, David W. Tiller, Branch Manager for IPRO, offered DI two options: a Value Added Reseller ("VAR") agreement and a Service Center agreement. Letter, D. Tiller to D. Schmidt, dated February 15, 1993 (Exhibit C to Schmidt Affidavit). Schmidt states that, in late February 1993, he "agreed with representatives of IPRO, including James Clemans, that we would enter into the Value Added Reseller and Service Agreements in the form proposed by IPRO." Schmidt Affidavit, ¶ 9, at 3. His statement is supported by a confirming letter he received from Clemans, dated February 24, 1993. The body of the letter, in its entirety, reads as follows:

> I am writing to confirm our discussions today and yesterday concerning upcoming business between IPRO, Inc. and Document Imaging, Inc.
>
> It is our understanding Dave Tiller with our IPRO Phoenix Branch will provide proposals for IPRO products and services to Sussman [sic] & Godfrey. IPRO will provide all products and services in connection with these two (2) initial projects and all others as they become available up to 200,000 pages for clients of your company. IPRO has dedicated tremendous resources in connection with demonstration equipment and related expenses for client presentations for Document Imaging. In order to recoup these expenses the 200,000 page level has been set for initial business to be done by IPRO for Document Imaging. As compensation to Document Imaging for the initial 200,000 pages, IPRO has agreed to provide 20% of image scanning revenues only toward the initial purchase price of Document Imaging Software and training.
>
> IPRO has agreed to formalize a VAR/Service Center relationship with Document Imaging. VAR/Service Center Agreements, pricing and additional VAR information will be shipped to you shortly. VAR system software must be purchased along with operator and system administrator training along with formalization of agreements for recognized IPRO VAR status. VAR/Service Center market rights, and other requirements will be reviewed to formalize agreements and expedite marketing efforts for Document Imaging. IPRO Sales Training will also be scheduled along with any additional product needs or training needs of your company.
>
> Please call should you have any additional questions. Dave will be contacting you shortly concerning project details. I will be following up with you on VAR/Service Center matters.

Letter, J. Clemans to D. Schmidt, dated February 24, 1993 (Exhibit D to Schmidt Affidavit).[3] The letter attached proposed VAR and Service Center agreements. Schmidt Affidavit, ¶ 9, at 3.

Clemans also sent a letter to Susman Godfrey, dated February 25, 1993, presenting a proposal and stating that "Document Imaging Inc. (Mr. David Schmidt) will gradually take over the management of your account

---

3. The Clemans letter dated February 24, 1993 has several handwritten alterations, which the parties stated at oral argument are not relevant to this Motion.

and provide local services and support, as a licensed IPRO reseller and Service Bureau." Letter, J. Clemans to Susman Godfrey, dated February 25, 1993 (Exhibit E to Schmidt Affidavit).

Schmidt states that, upon receipt of the February 24, 1993, letter he "continued to work diligently ... to close the Susman Godfrey and Coastal contracts," since from the letter he "understood and expected that IPRO had accepted those agreements and would execute them." Schmidt Affidavit, ¶ 11, at 3. He further states that he would not have done so "absent IPRO's commitment to [VAR] and Service Agreements with Document Imaging," id., and that from February until May, 1993, "no representative of IPRO ever suggested that the [VAR] and Service Agreements would not be finalized" as had been stated in the February 24, 1993, letter. Id. ¶ 12, at 3.

In May 1993 the Coastal contract closed, and Schmidt scheduled a final presentation for May 13, 1993. However, Schmidt states that, on the night before the meeting, he received a telephone call from Diana DiCioccio and David Tiller of IPRO, who "informed [him] for the first time that IPRO would make the sale to Coastal directly and without benefit of the promised [VAR] and Service Agreements through [DI]." Id. ¶ 13, at 4.[4]

IPRO claims that the parties never reached a final, complete, written agreement, and thus that there is no contract between the parties and that DI's claims all must fail. Jim King, President and Chairman of the Board of Directors of IPRO, Inc., states in his affidavit that IPRO never signed, drafted, or negotiated a VAR Agreement or Service Agreement with DI, that IPRO never agreed orally or in writing to a specific VAR or Service Agreement with DI, that it is IPRO's policy to have only written VAR and Service Agreements, and that IPRO did not intend to be bound by any proposed agreement until the written VAR and Service Agreements had been executed on terms mutually accept-

able to both parties. Affidavit of Jim King (Exhibit 1 to Motion) ("King Affidavit"), at 1–2.[5]

Schmidt admits that there was no specific agreement signed by the parties, and stated in his deposition that he was claiming that his contract with IPRO was "verbal." Schmidt Deposition, at 71 (Exhibit 1 to Affidavit of Allan B. Diamond (Exhibit 2 to Motion)). DI, however, alleges that, because of the series of writings between IPRO and DI, the parties had a contract, and IPRO breached the contract. DI also argues that IPRO committed fraud when it misrepresented its intention to enter into and to perform the VAR and Service Center agreements.

### SUMMARY JUDGMENT STANDARD

In deciding a motion for summary judgment, the Court must determine whether "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 322–23, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986); Little v. Liquid Air Corp., 37 F.3d 1069, 1075 (5th Cir.1994) (en banc); Bozé v. Branstetter, 912 F.2d 801, 804 (5th Cir.1990). The facts are to be reviewed with all inferences drawn in favor of the party opposing the motion. Bozé, 912 F.2d at 804 (citing Reid v. State Farm Mut. Auto Ins. Co., 784 F.2d 577, 578 (5th Cir.1986)). However, factual controversies are resolved in favor of the nonmovant "only when there is an actual controversy, that is, when both parties have submitted evidence of contradictory facts." McCallum Highlands, Ltd. v. Washington Capital Dus, Inc., 66 F.3d 89, 92 (5th Cir.), revised on other grounds upon denial of reh'g, 70 F.3d 26 (5th Cir.1995).

The party moving for summary judgment has the initial burden of demonstrating the

---

4. Schmidt believes that IPRO continues to profit from its relationship with Coastal, without any payment to DI. Id. There is no proof in the record on this issue; however, it is immaterial to the outcome of this Motion.

5. DI has filed, along with its Response to the Motion to Strike the Schmidt Affidavit, a Cross–Motion to Strike the Affidavits of King and Tiller. See Doc. # 31. This motion is without merit and is denied.

absence of a material fact issue with respect to those issues on which the movant bears the burden of proof at trial. For any matter on which the nonmovant carries the burden of proof at trial, however, the movant may, by merely pointing to the absence of evidence supporting the essential elements of the nonmovant's case, shift to the nonmovant the burden of demonstrating by competent summary judgment proof that there is an issue of material fact so as to warrant a trial. *Transamerica Ins. Co. v. Avenell,* 66 F.3d 715, 718–19 (5th Cir.1995); *Forsyth v. Barr,* 19 F.3d 1527, 1533 (5th Cir.), *cert. denied,* 513 U.S. 871, 115 S.Ct. 195, 130 L.Ed.2d 127 (1994).

The nonmovant's burden may not be satisfied by conclusory allegations, unsubstantiated assertions, metaphysical doubt as to the facts, or a scintilla of evidence. *Douglass v. United Services Auto. Ass'n,* 65 F.3d 452, 459 (5th Cir.1995), *revised on other grounds,* 79 F.3d 1415 (5th Cir.1996) (en banc); *Little,* 37 F.3d at 1075. In the absence of any proof, the court will not assume that the nonmovant could or would prove the necessary facts. *McCallum Highlands,* 66 F.3d at 92; *Little,* 37 F.3d at 1075 (citing *Lujan v. Nat'l Wildlife Fed'n,* 497 U.S. 871, 888, 110 S.Ct. 3177, 3188, 111 L.Ed.2d 695 (1990)). Rule 56 mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a sufficient showing of the existence of an element essential to the party's case, and on which that party will bear the burden at trial. *Little,* 37 F.3d at 1075 (citing *Celotex,* 477 U.S. at 322, 106 S.Ct. at 2552).

## DISCUSSION

### Statute of Frauds

■■■ IPRO argues that the statute of frauds precludes any VAR or Service Center Agreement between IPRO and DI. The Texas statute of frauds provides that an agreement which is not to be performed within one year from the date of making the agreement is not enforceable unless the agreement is in writing and signed by the party to be charged. Tex.Bus. & Com.Code § 26.01 (Vernon 1987). In order to satisfy the statute of frauds, " 'there must be a written memorandum which is complete within itself in every material detail, and which contains all of the essential elements of the agreement, so that the contract can be ascertained from the writings without resorting to oral testimony'." *Padilla v. LaFrance,* 907 S.W.2d 454, 460 (Tex.1995) (quoting *Cohen v. McCutchin,* 565 S.W.2d 230, 232 (Tex.1978)). This written memorandum "need not be contained in one document." *Id.*

■■■ The VAR and Service Center agreements were not performable within one year, and therefore are subject to the statute of frauds.[6] DI's position in this lawsuit is that IPRO "provided the written form agreement and then also agreed, in writing, to enter into that written agreement" with DI. Response, at 2. However, DI has not presented sufficient evidence that all material terms and essential elements of these agreements were in writing, so as to satisfy the statute of frauds. In particular, the form agreements in the record do not reflect any agreement between the parties on such material terms as geographic region and sales quotas,[7] and DI has directed the Court to no writing containing such terms. Additionally, although the section regarding price refers to the prices and fees "set forth in schedule 1 attached hereto," there is no Schedule 1 attached to the agreements furnished to the Court.[8] Furthermore, the Schmidt Affidavit

---

6. The form agreements introduced into the record by both parties have an initial term of 24 months. *See, e.g.,* Exhibit 1 to King Affidavit, ¶ 9.01, at 9. Plaintiff has not argued that the term of the contract precludes application of the statute of frauds.

7. DI has provided the Court with two versions of the form VAR agreement. The first form, faxed from IPRO to Schmidt in January 1992, contains blanks in Schedule 2 where the geographic mar-

ket is to be filled in, as well as in Schedule 4 where minimum quotas are to be filled in. Exhibit B to Schmidt Affidavit, at 17, 19. The second form, attached to Cleman's letter of February 24, 1993, is incomplete and has only five pages, but also does not provide these terms. Exhibit D to Schmidt Affidavit.

8. Exhibit B to Schmidt Affidavit, ¶ 3.02, at 3. Schedule 1, which should be page 16 of the form agreement, is missing from the furnished copy.

does not state that these terms were actually agreed upon, nor does it state what the agreed terms were. *See* Schmidt Affidavit.

 DI stated at oral argument only that some terms were left open for future negotiation, but that these terms were relatively inconsequential and that disagreement on those terms would not have prevented the parties from reaching final agreement. However, while the issue of whether the missing terms were "deal-breakers" might be relevant to the question of whether the parties had a "meeting of the minds,"[9] it is not dispositive on the statute of frauds issue. Terms such as pricing, minimum quotas and geographic region are not incidental but are material, essential elements of a contract between the parties. *Compare Copeland v. Merrill Lynch & Co., Inc.*, 47 F.3d 1415, 1426 (5th Cir.1995) (citing *T.O. Stanley Boot Co. v. Bank of El Paso*, 847 S.W.2d 218, 221 (Tex. 1992)). Although DI argues that the parties might have intended to be bound without actually agreeing on such terms, such imprecise agreement, without writing, cannot satisfy the statute of frauds. Furthermore, the statement in IPRO's letter of February 24, 1993, that IPRO had "agreed to formalize" a relationship with DI indicates only that the relationship would be entered into in the future and is insufficient to satisfy the statute of frauds. *See Southmark Corp. v. Life Investors, Inc.*, 851 F.2d 763, 767 (5th Cir. 1988) ("[u]nder Texas law ... a writing that contemplates a contract to be made in the future does not satisfy the requirements of the statute of frauds. Indeed, it is common sense that 'futuristic' language in a writing is 'not confirmatory of a contract already in existence'") (quoting *Martco, Inc. v. Doran Chevrolet, Inc.*, 632 S.W.2d 927, 928–29 (Tex. App.—Dallas 1982, no writ)) (footnote omitted).

In this case, the Court is unable to "ascertain" the contract between the parties "with-

out resorting to oral testimony." *See Padilla*, 907 S.W.2d at 460. Therefore, the Court holds that, as a matter of law, the statute of frauds precludes the existence of VAR and Service Center Agreements between DI and IPRO.

 DI also raises the argument that equitable estoppel should prevent application of the statute of frauds. The Fifth Circuit has held that, under certain circumstances, "an oral promise to sign a written agreement *that complies with the statute of frauds* is enforceable and sufficient to overcome a statute of frauds defense." *Southmark*, 851 F.2d at 769 (emphasis added) (discussing Texas Business and Commerce Code § 8.319). *See Neeley v. Bankers Trust Co. of Texas*, 757 F.2d 621, 630 & n. 7 (5th Cir.1985) (discussing Section 26.01); *Reynolds v. Stevens Studios*, 659 F.2d 44, 45 (5th Cir. Unit A 1981) (discussing Section 26.01). The oral promise must be to sign "a written agreement that had already been prepared." *Id.*

In the instant case, even if IPRO's letter of February 24, 1993, were construed as a promise to enter into a written agreement, there is no evidence that a written agreement that would comply with the statute of frauds had already been prepared. *See Southmark*, 851 F.2d at 769. Indeed, as held above, the form agreements that were sent from IPRO to DI were lacking essential terms. *Compare Neeley*, 757 F.2d at 630 n. 7 ("[t]he same indefiniteness that makes the putative contract unenforceable prevents Neeley from prevailing on a promissory estoppel theory"). Therefore, the Court holds that, as a matter of law, equitable estoppel cannot bar application of the statute of frauds in the circumstances of this case.

### Fraud

 DI has brought a cause of action for fraud.[10] DI argues specifically that

---

Furthermore, it appears that the Service Center Agreement included in Exhibit B cannot stand alone because it is premised upon a previously entered VAR Agreement.

**9.** IPRO strenuously argues that there was no meeting of the minds and that no contract existed between the parties, either written or oral. However, given the holding that the statute of

frauds precludes the existence of an enforceable VAR or Service Center agreement, the Court need not and does not address this argument.

**10.** The *prima facie* elements of fraud under Texas law are:

 (1) The defendant made a material representation;

IPRO fraudulently induced DI to enter into VAR and Service Center Agreements that IPRO never intended to perform. DI also may be arguing that IPRO fraudulently misrepresented its intent to contract, so as to induce DI to work on the Susman Godfrey and Coastal contracts and thus allow IPRO to gain access to these customers.

Since DI's claim of fraudulent inducement to enter a VAR and Service Center Agreement requires that those contracts have been created, and since the Court has previously held that the statute of frauds precludes the existence of an enforceable contract, DI's fraudulent inducement claim must fail. Summary judgment is therefore granted on DI's fraudulent inducement claim. DI is granted **ten (10) days** from the date of this Memorandum and Order to file an amended complaint and replead its fraud claim in light of this opinion, should it choose to do so.

### Lost Profits Damages

■ IPRO seeks summary judgment that DI is precluded as a matter of law from recovering all lost profits other than those related to the transaction with the Coastal Corporation.

■ Lost profits may be recovered when there is "data from which they may be ascertained with a reasonable degree of certainty and exactness." *Texas Instruments v. Teletron Energy Mgt.*, 877 S.W.2d 276, 279 (Tex.1994) (quoting *Southwest Battery Corp. v. Owen*, 131 Tex. 423, 115 S.W.2d 1097 (1938). Determination of lost profits is a fact-intensive inquiry, and recovery can be precluded by factors such so as absence of profit history, changing market conditions, chancy business opportunities, promotion of untested products, entry into unknown or unviable markets, or new and unproven en-

terprises. *Hiller v. Manufacturers Product Research Group*, 59 F.3d 1514, 1520 n. 11 (5th Cir.1995); *Teletron*, 877 S.W.2d at 279–80; *Holt Atherton Industries, Inc. v. Heine*, 835 S.W.2d 80, 84 (Tex.1992)). The determination of "reasonable certainty" is intended to be "flexible enough to accommodate the myriad circumstances in which claims for lost profits arise." *Teletron*, 877 S.W.2d at 279.

■ IPRO argues that DI is precluded as a matter of law from recovering lost profits because it has no history of profitability and because it cannot demonstrate the actual existence of lost contracts, other than the contract with the Coastal Corporation.[11] However, "[u]nder Texas law a business's failure to demonstrate a history of profitability should be considered, but is not independently dispositive, in deciding whether lost profits may be recovered." *Hiller*, 59 F.3d at 1518. Moreover, DI has raised several arguments, such as Schmidt's relevant work experience and a comparison with profits of other companies with which IPRO entered into VAR and Service Agreements, going to DI's anticipated profits.

DI has requested discovery from IPRO regarding IPRO's sales to other parties, so as to collect evidence going to its lost profits. IPRO has represented to the Court that, although it takes the position that such evidence is irrelevant to this case, it will produce the documents. Reply, at 7. This response is appropriate in light of DI's arguments. However, since discovery is not yet completed and the deadline has been extended until February 28, 1997, consideration of summary judgment on this issue is premature. *See* Fed.R.Civ.P. 56(f). Therefore, IPRO's motion for summary judgment on

(2) The representation was false;
(3) The defendant/speaker made the representation knowing it was false, or made it without any knowledge of its truth;
(4) The speaker made the representation with the intention that it should be relied upon by the parties;
(5) The plaintiff acted in reliance upon the misrepresentation; and
(6) The plaintiff suffered injury.
*Oppenheimer v. Prudential Securities, Inc.*, 94 F.3d 189, 194 (5th Cir.1996); *Norman v. Apache Corp.*, 19 F.3d 1017, 1022 (5th Cir.1994); *DeSan-*

*tis v. Wackenhut Corp.*, 793 S.W.2d 670, 688 (Tex.1990), *cert. denied*, 498 U.S. 1048, 111 S.Ct. 755, 112 L.Ed.2d 775 (1991).

11. Schmidt testified in his deposition that DI had no annual financial statements or income statements, that no sales were consummated through DI, that DI owned no assets and had no leasing obligations, and that DI had no bank accounts or employees. Schmidt Deposition, at 17–20. DI did file corporate tax returns. *Id.* at 19.

lost profits damages is denied without prejudice.

## CONCLUSION

For the reasons stated herein, it is now

**ORDERED** that IPRO's **Motion for Summary Judgment** [Doc. # 19] is **GRANTED IN PART.** In particular, summary judgment is granted as to DI's claims for breach of contract and fraudulent inducement to contract. It is further

**ORDERED** that IPRO's **Motion to Strike Affidavit of David Schmidt** [Doc. # 27] is **DENIED.** It is further

**ORDERED** that DI's **Cross–Motion to Strike Affidavits of King and Tiller** [Doc. # 31] is **DENIED.** It is further

**ORDERED** that DI is to file an amended complaint within ten (10) days of this Memorandum and Order.